UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BOARD OF TRUSTEES OF THE HEALTH )
AND WELFARE DEPARTMENT OF THE )
CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )
CHICAGO AND VICINITY, )
                                                  )
                    Plaintiff,                    )
                                                  )
         v.                                       )          12 C 4097
                                                  )
ALLISON ENTERPRISES, INC. d/b/a )
MID AMERICA VISION, MID AMERICA )
BENEFIT SERVICES, INC., and )
LAWRENCE SILVER, )
                                                  )
                    Defendants.                   )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on the motion for summary judgment of

Plaintiff Board of Trustees of the Health and Welfare Department of the Construction

and General Laborers' District Council of Chicago and Vicinity (the "Fund") pursuant

to Federal Rule of Civil Procedure 56 ("Rule 56") against Defendants Allison

Enterprises, Inc. d/b/a Mid America Vision ("MAV"), Mid America Benefit Services,

Inc. ("MABS") (collectively "Mid America")[1] and Lawrence Silver ("Silver")

("Defendants"). Also before the Court is Silver's motion to strike portions of the

---

[1] The Fund refers to MAV and MABS collectively throughout their briefs as "MAV," where
Silver differentiates the two corporations separately as MAV and MABS.

Fund's Statement of Facts. For the following reasons, the Court grants summary judgment in favor of the Fund and denies Silver's motion to strike.

## BACKGROUND

### I. Facts

The following facts are taken from the parties' respective statements and exhibits filed pursuant to Northern District of Illinois Local Rule 56.1. Mid America is not represented by counsel and failed to file: (i) a response to the Fund's Rule 56.1(a)(3) statement as required by Rule 56.1(b)(3)(B); (ii) a Rule 56.1(b)(3)(C) statement of additional facts; or (iii) a response to the motion for summary judgment. The Fund's factual allegations as to Mid America are therefore deemed admitted to the extent they are supported by the record. *See* N.D. Ill. L.R. 56. 1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *see also Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003).

As a threshold matter, this Court must first address the sufficiency of the Fund's Rule 56.1 Statement of Facts. Silver argues that the Fund's Statement of Facts are not in compliance with the applicable local rules, in that the Fund's responses contain numerous hearsay statements, improperly authenticated exhibits, legal conclusions, impermissible citations to deemed admissions of Mid America, and citations to pleadings from separate litigation. This Court has considered Silver's motion to strike. We review each Local Rule 56.1 statement and disregard any

argument, conclusion, or assertion unsupported by the evidence in the record. The Court is mindful of its duty to weigh the credibility of the evidence presented by both parties and only relies on relevant, admissible evidence when ruling on the motion for summary judgment.

Silver makes specific arguments for Mid America throughout his papers. However, his attorneys do not represent Mid America. Mid America never formally responded to the motion for summary judgment. To the extent that the record supports the facts against Mid America, the Court admits them as true. Silver's main concern is that these facts may implicate him because he worked as the sole shareholder and president of the corporations. The Court takes this into consideration when ruling on this motion. *See Allen v. Destiny's Child*, 06 C 6606, 2009 WL 2178676, at *2 (N.D. Ill. July 21, 2009) (citing Fed. R. Civ. P. 36(b) when stating " . . . a plaintiff cannot use one defendant's deemed admissions as evidence against a codefendant.").

The parties do not dispute the facts below unless otherwise noted.

**A. The Parties, the Agreement, and Procedures**

The Fund is an employee benefit plan ("Plan"). MAV and MABS are Illinois corporations. Silver is the president and sole shareholder of MAV and MABS. Beginning on July 1, 1997, the Fund entered into a Vision Services Discount Fee Agreement (the "Agreement") with Defendants. Attached to the Fund's first amended complaint is a copy of the Agreement that is not signed or dated. Since it lacks proper

execution by the parties, Silver disputes the Agreement's validity and argues that the Fund and Defendants did not operate under its terms.

Under the Agreement, the Fund's Plan participants and beneficiaries would take advantage of Mid America's network, or in other words, pre-negotiated schedules of benefits with participating vision care providers ("Providers"). The Agreement states "Mid America will not charge the Fund any fee, other than set forth in paragraph 1a." Paragraph 1a states that "Mid America . . . shall charge to the Fund the fees set on Exhibit A, items 1 through 4 for the provision of the stated services and items to Fund participants and beneficiaries." Exhibit A was not provided to the Court by either party.

With or without an executed Agreement, Silver and the Fund agree that their roles consisted of the following: The Fund processed claims of its Plan participants and beneficiaries through adjusters and had final authority to approve or reject claims. The Fund decided whether to pay an approved claim to Mid America for disbursement to a Provider and instructed Mid America which Providers to pay. The Fund also reviewed claims issues related to subrogation and coordination of benefits. The Fund created Explanation of Benefits ("EOB") forms that reflected whether a claim would be paid. The Fund provided these EOB forms with every lump sum check submitted to Mid America so that it knew how much to pay from that check to each Provider for each claim. Mid America did not issue EOB forms.

As for Mid America, it received periodic payments from Providers to participate in its network of vision care providers. The Fund tendered checks to Mid America made payable to "Mid America Vision," which were subsequently endorsed by MAV as "deposit only" and deposited into the bank accounts of both MAV and MABS. These checks were to be disbursed to the Providers and the Fund gave Mid America instructions as to how to distribute the money. Silver's name was listed as an addressee on the primary bank account.

Mid America was additionally responsible for resolving claim disputes if there was a discrepancy between services rendered and services actually charged on claim forms submitted to the Fund. Further, if the Fund was unable to pay a Provider claim submitted through Mid America due to an issue with the claim, such as eligibility or lack of an accompanying explanation of benefits, the Fund would send the claim back to Mid America for the claim issue to be corrected by Mid America with the Providers.

**B. Provider Agreement**

In the many Mid America Vision Optometrist Provider Agreements ("Provider Agreement"), signed by Silver and various Providers, it states "Mid America has, and will continue to, enter into arrangements with group subscribers and individuals in which employees and individuals (and their dependents) will be eligible to receive eye examinations, optical hardware and products . . . based on a fee schedule or a negotiated schedule of benefits. . ." Also, the Provider Agreement states that

Mid America would monitor Providers' performance, and follow up on and work with Providers to eliminate complaints. Providers paid Mid America money each month in turn for Mid America's services.

### C. Role of Silver

Besides Silver, the only other individuals identified as employees of Mid America were Patricia Tracy ("Tracy"), who acted as the vice president and Caroline Cassidy ("Cassidy"), who worked as an employee. However, Tracy and Cassidy were paid through Sync Capital, a company owned by Silver, which also provided payroll services to Mid America.

According to Tracy's declaration, she discloses that she performed the day-to-day operations for Mid America such as entering claims, logging claims, depositing checks, printing checks, logging and paying expenses, and logging EOB forms. Tracy also states that Silver determined which Providers got paid, or did not get paid, pursuant to the EOB forms, but he did not make any determinations concerning eligibility, coverage or resolve disputes over claim forms. Tracy submits that Silver did not deposit the checks from the Fund, but some checks in evidence are signed by Silver. Tracy also asserts that MABS's rent was paid through Sync Capital.

As for record keeping, Silver produced three one-page documents during discovery that he considers minutes from annual meetings of Mid America for each of the following dates: September 3, 2009, September 7, 2010 and August 31, 2011. He also provided the bylaws for both MABS and Allison Enterprises.

**D. Financial Issues and Termination of the Arrangement**

On September 19, 2011, Silver took a $45,000 loan from MABS (the "September 19th Loan"). MABS's shareholder loans report produced by Silver states that the $45,000 was a "loan to a shareholder." However, MABS's bank account summary lists the $45,000 transaction as a "bill payment" to Tavernita Chicago LLC ("Tavernita"), a restaurant which Silver has a relationship with through his company, Sync Capital. A check dated September 19, 2011 made out to Tavernita is signed by Silver. Deposit slips from this bank account also show deposits made on behalf of Mercadito, another restaurant in which Silver is associated with through Sync Capital.

On or about October 6, 2011, the Fund sent a letter ("Termination Notice") to Mid America notifying it that the Fund "has decided to terminate its arrangement with Mid America Vision for vision benefit services, effective as of 12:00 a.m. on January 1, 2012." The Termination Notice stated that "[f]ollowing the effective day of termination of this Agreement, each party shall remain liable for any obligations or liabilities arising from activities carried on prior to the effective date of termination." After issuing the Termination Notice, Mid America continued to forward claims to the Fund, and accordingly, the Fund continued to tender checks for payment to MAV. The parties dispute the amount that the Fund paid to MAV between the date of the Termination Notice and December 31, 2012—Silver argues it is approximately $701,318.53 and the Fund claims it is over $1,000,000.

On November 9, 2011, after the Fund notified MAV that it was terminating the arrangement, a cashier's check was issued to Silver from MAB's bank account for $65,000 (the "November 9th Loan"). This transaction was listed as a loan to shareholder on MAV's shareholder loan report. Silver admits in his requests for admissions that he received "a loan of $65,000 from MAV to Sync Capital." On that same day, Sync Capital received a deposit of $65,000.

MABS provided balance sheets for each month in 2011, which indicated loans to shareholders. MABS's Ledger and 2011 Profit and Loss Statements show payments for rent, stationary, supplies, office expenses and utilities were made from MABS's bank account and numerous other businesses were also located in the same location as Mid America. MABS made the payments for various utilities and office needs directly from its bank account. The 2011 Profit and Loss Statement also shows that MABS paid $36,676 for its lease, $150,748 in payroll, and that approximately 97.5% of MABS's total income came from the Fund. It does not reflect income from Providers who paid a monthly fee to Mid America to be part of its network.

A MABS Ledger also shows the following payments were made from MAV's primary bank account: (i) $150,094.91 to Sync Capital; (ii) $45,000 to Tavernita (the September 19th Loan); $1,520.43 to Mercadito Chicago; (iii) $8,388.09 to Patricia Tracy; (iv) $13,012.55 to American Life Insurance; (v) $2,880 to Universal Refrigeration; and (vi) $30,240 to Anthony Sauro ("Sauro"), totaling $251,135.98. This amount exceeds the $179,000 in 2011 income to MABS's primary bank account

that did not come directly from the Fund to pay approved Provider claims. Silver disputes this and claims that the corporate defendants owed him $279,202. On October 26, 2012, after receiving the Termination Notice and after this lawsuit was filed, Mid America paid $75,000 to its former attorney in this case from MABS's primary bank account.

Allison Enterprises and MABS also had bank accounts at Northern Trust. The Northern Trust bank statements show that transfers were made from Allison Enterprises's bank account to unidentified checking accounts, totaling $70,400. One of the unidentified checking accounts belongs to Sync Capital according to a deposit slip for a $65,000 deposit made to Sync Capital on October 9, 2011. The Northern Trust bank statements from MABS's account show that transfers were made to unidentified checking accounts, totaling $2,626.

### E. Missing Assets

Providers contacted or attempted to contact Silver regarding Mid America's failure to pay approved claims on behalf of Plan participants and beneficiaries. The Fund and Silver dispute the amount of missing assets to Providers in payment for approved claims. The Fund argues that there is $492,360.64 in missing assets.

On March 30, 2012, the Fund sent correspondence to Silver requesting that Mid America pay the outstanding Provider claims. On April 5, 2012, Tracy forwarded that correspondence to Silver. On April 4, 2012, the Fund wrote to Anthony Sauro, the broker who introduced the Fund to Defendants, stating that it had attempted to contact

Silver and Tracy, but received no response. The Fund asked Sauro to help rectify the matter so that Plan participants and beneficiaries would be protected. Also on April 4, 2012, Tracy forwarded the Fund's correspondence with Sauro to Silver. Mid America also received communications from Providers.

Several Providers have filed suit against Mid America for unpaid claims for breach of contract and unjust enrichment. Since December 2013, Silver has paid settlements to some Providers. The amounts actually paid are in dispute. On December 18, 2013 at his scheduled deposition, Silver invoked his right under the Fifth Amendment of the Constitution against self-incrimination for every question except when identifying his name.

## II. Procedural History

On October 10, 2012, the Fund filed its first amended complaint against Defendants pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq*. ("ERISA") and brings its claims under ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3). Jurisdiction is proper under 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. §§1391(b)(2) and 1132(e)(2). The Fund alleges in its four-count complaint that Defendants breached their fiduciary duties and were unjustly enriched when Defendants withheld Plan assets and failed to pay Providers as required under the Agreement. The Fund seeks: (i) restitution of all monies paid by the Fund to Mid America which were not used to pay approved Provider claims; (ii) an accounting of all Mid America funds received

and/or paid in relation to the Fund from January 1, 2012 to December 13, 2012; (iii) judgment against Mid America for any losses to the Plan; (iv) judgment against Silver for any losses to the Plan; (v) equitable relief, including but not limited to, the return or repayment of all amounts which have unjustly enriched Mid America and/or Silver; (vi) injunctive relief and disgorgement of all profits; and (vii) attorney's fees.

On November 16, 2012, Mid America answered the amended complaint and filed a third party complaint and counterclaims against the Fund. On June 10, 2013, this Court dismissed Mid America's third-party complaint and counterclaims. On September 3, 2013, counsel for Mid America withdrew from the case. On September 30, 2013 counsel for Silver clarified that it only represents Silver. Mid America remains unrepresented by counsel. On April 10, 2014, the Fund filed the instant motion for summary judgment against Defendants for breach of fiduciary duty and unjust enrichment. On June 27, 2014, Silver responded to the Fund's summary judgment motion, responded to the Fund's Statement of Facts, and filed his Statement of Additional Facts. Mid America failed to respond to the motion for summary judgment.

Also on June 27, 2014, Silver filed a motion to strike certain paragraphs of the Fund's Rule 56.1 Statement of Facts and affidavits in support. On July 24, 2012, the Fund responded to the motion to strike. Mid America failed to respond to this motion as well.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery, disclosures, and affidavits establish that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the movant bears the burden of proof at trial. *Id.* at 325. The non-movant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with documentary evidence. *Id.* A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court construes all facts and draws all reasonable inferences in favor of the non-movant. *Id.* at 255.

## DISCUSSION

Before the Court addresses the issues in the instant motion for summary judgment, the following matters, some of which Silver flags in his motion to strike, require attention.

## I. Preliminary Matters

### A. Single Corporate Entity

The Fund insists that MAV and MABS constitute one single corporate enterprise that acted as a fiduciary to the Plan and collectively refer to MAV and MABS as "MAV" throughout its papers. MAV and MABS failed to respond to the motion for summary judgment, but Silver addresses this issue in a footnote of his response to the motion for summary judgment stating that even though the Fund collectively refers to MAV and MABS as "MAV" throughout its motion and reply, the Fund has not established that MAV (as opposed to MABS) undertook any of the acts alleged.

Two corporate entities may constitute a single entity when they "operate as an integrated enterprise and exert significant control over the employees in question." *Laborers' Pension Fund v. Surface Dimensions, Inc.*, 2011 WL 841515, at *7 (N.D. Ill. 2011) (quoting *Naperville Ready Mix, Inc. v. NLRB*, 242 F.3d 744, 752 (7th Cir. 2001). To make such determinations, a court looks to a four-factor test: (i) common management; (ii) centralized control of labor relations; (iii) interrelation of operations; and (iv) common ownership or financial control. *Id.* (internal citations omitted). No single factor is determinative; rather the court must make its judgment based on the totality of the circumstances. *Esmark, Inc. v. NLRB*, 887 F.2d 739, 753 (7th Cir. 1989).

When utilizing the four-factor test, the evidence suggests that MAV and MABS comprise an integrated enterprise that constitutes a single corporate entity. Looking at the totality of the circumstances, the corporations shared common ownership since Silver acted as the president and sole shareholder of both. MAV and MABS also operated out of the same office and both provided services to the Plan. Tracy's declaration reveals that she was familiar with both MABS and MAV, and that she and Cassidy handled the everyday operations of both. Tracy and Cassidy consider themselves employees of "Mid America" and do not differentiate the two. Adding to the interrelation of the operations, the Fund tendered checks to Mid America made payable to "Mid America Vision" and "Mid America," which were deposited into both MAV and MABS's bank accounts. The intermingled relationship between the two corporations is also shown through the obvious fact that MAV and MABS share the first two words "Mid America." All of this evidence is sufficient to establish that MAV and MABS are a single integrated corporate entity. Throughout the remainder of the opinion, this Court will continue to refer to MAV and MABS as "Mid America."

### B. The Fund as a Plan Under ERISA

Silver questions whether the Fund is a plan under ERISA. ERISA defines a "plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both . . ." 29 U.S.C. § 1002(3). An "employee welfare benefit plan" is "any plan, fund, or a program . . . established or maintained by an employer . . . for

the purpose of providing . . . medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1). In the instant case, the employers of the Fund's Plan participants established the Fund for the purpose of providing the Plan participants and beneficiaries with vision care. Accordingly, this Court finds that the Fund meets the statutory definition of an employee welfare benefit fund.

### C. Plan Assets

The Fund and Silver dispute whether the payments the Fund "tendered" to MAV are considered "Plan assets." Silver argues that no evidence has been provided to establish that the Fund money paid to Defendants constitute Plan assets under ERISA. Without this evidence to demonstrate that the money at issue was in fact Plan Assets, Silver avers that the Fund cannot prevail.

ERISA itself does not define what constitutes an asset of an ERISA Fund. The Department of Labor has instructed that:

> "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law. In general, the assets of a welfare plan would include any property, tangible or intangible, in which the plan has a beneficial ownership interest."

Department of Labor Advisory Opinion No. 93-14A (May 5, 1993), 1993 WL 188473, at *4, quoted in *Navarre v. Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005) and *Central Ill. Carp. Health & Welfare Trust Fund v. S & S Fashion Floors, Inc.*, 516 F.

Supp.2d 931, 934-35 (C.D. Ill. 2007). A definition of plan assets is also found in a Department of Labor regulation, which states:

> "the assets of a plan include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution to the plan as of the earliest date of which such contributions can reasonably be segregated from the employer's general assets."

29 C.F.R. § 2510.3-102.

Although the Agreement lacks signatures, this Court still finds the parties were acting in conformance with its terms. The employers of the Fund's Plan participants contributed to the Fund for the purpose of providing the Plan participants and beneficiaries with vision care. The Fund sent checks made payable to Mid America from the Plan's account to disburse the Fund's money to Providers who serviced the Plan participants and beneficiaries. The Fund may have decided which Providers to pay, but pursuant to the Department of Labor regulations, the money given to Defendants was still Plan property, which the Plan held beneficial ownership interest in. Since the purpose behind the Fund giving money to Defendants was to allow its Plan participants and beneficiaries to take advantage of Mid America's network, the money is therefore, "Plan assets."

### D. Silver's Refusal to Testify

Silver expresses concerns about the Court making adverse inferences based on the invocation of his Fifth Amendment privilege. It is well-established that the privilege against self-incrimination "cannot be invoked as a shield to oppose

depositions while discarding it for the limited purpose of making statements to support [or oppose] a motion for summary judgment." *Surface Dimensions, Inc.*, 2011 WL 841515, at *7 (quoting *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991). Although a civil litigant may raise the privilege, it "cannot be invoked to oppose discovery and then tossed aside to support a party's assertions." *LaSalle Bank Lake View v. Seguban*, 937 F.Supp. 1309, 1320 (N.D. Ill. 1996) (citation omitted). Adverse inferences from assertion of the privilege are allowed in civil cases against the party-witness who invoked it. *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993). An adverse inference from a party's silence may not be warranted in all cases. *Surface Dimensions, Inc.*, 2011 WL 841515, at *7. This Court will not immediately draw adverse inferences against Silver because he invoked his Fifth Amendment privilege during his deposition. However, if warranted, the Court reserves the right to do so.

## II. Motion for Summary Judgment

### A. Fiduciary Duty

To establish a breach of fiduciary duty under ERISA, the Fund must show that: (i) Defendants are plan fiduciaries; (ii) Defendants breached their fiduciary duty; and (iii) the breach caused some harm to the Fund. *Kamler v. H/N Telecomm. Servs.*, 305 F.3d 672, 681 (7th Cir. 2004). The term "fiduciary" under ERISA has consistently been given a broad meaning. *See Baker v. Kingsley*, 387 F.3d 649, 663-64 (7th Cir. 2004) ("liberal standard for fiduciary status").

Pursuant to ERISA, a fiduciary is defined as follows:

[A] person is a fiduciary with respect to a plan to the extent: (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets; (ii) he renders investment advice for a fee or other compensation, direct or indirect with respect to any moneys or other property of such plan, or has any authority or responsibility to do so; or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A). A fiduciary within the meaning of ERISA must be someone "acting in the capacity of manager, administrator, or financial adviser to a 'plan.'" *See Brooks v. Pactiv Corp.*, 729 F.3d 758, 765 (7th Cir. 2013) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 222 (2000). ERISA defines fiduciary in *functional* terms of control and authority over the Plan. *Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993).

It is important to note that the latter half of subsection (i) omits "discretionary" and the Seventh Circuit recently found that authority or control respecting management or disposition of assets need not be "discretionary." *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 913 (7th Cir. 2013) *cert denied*, 134 S. Ct. 1280 (2014) (" . . . we not make explicit that insofar as management or disposition of assets is concerned, there is no separate requirement of discretionary authority or control.") (internal quotations omitted). Other circuits have also found that ministerial control or authority over plan assets is sufficient to make a person or entity a fiduciary under

subsection (i) of 29 U.S.C. § 1002(21). *See Chao v. Unique Mfg. Co., Inc.*, 649 F. Supp. 2d 827, 832 (N.D. Ill. 2009) (citing cases).

### 1. Mid America

In his briefs, Silver attempts to argue on behalf of unrepresented Mid America. However, the Court must look to whether the record, including the facts admitted against Mid America, supports that Mid America is a fiduciary. Since this Court already determined that the money given to Mid America was Plan assets, the question is whether Mid America either exercised *any* discretionary authority or discretionary control respecting management of such plan *or* exercises *any* authority or control respecting management or disposition of its assets under subsection (i).

Using the plain language of the statute, evidence of Mid America's authority or control respecting management of the Plan or over the disposition of the Plan assets is lodged in the following undisputed facts. According to the arrangement between the Fund and Mid America, Mid America was responsible for resolving claim disputes if there was a discrepancy between services rendered and services actually charged on claim forms submitted to the Fund. *See Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 811-12 (7th Cir. 2006) (where the Seventh Circuit determined that an insurance company was a fiduciary when it agreed to exercise authority over the plan and was granted the same discretionary authority as the original plan administrator). The Provider Agreement between Mid America and Providers states that Mid America will continue to enter into arrangements in order to provide Plan participants and

beneficiaries with vision care benefits. It also notes that Mid America would monitor Providers' performance, and follow up on work with Providers to eliminate complaints.

Mid America also received checks from the Fund to be disbursed to the Providers with EOB forms explicitly stating which Provider to pay and for how much. Even with the Fund's specific instructions on how to disburse the Plan assets, this Court holds that Mid America still possessed authority and control over the Plan assets. In fact, Mid America took even more control over Plan assets when it chose to ignore and defy these instructions by failing to pay participating Providers who treated the Plan's participants and beneficiaries, and ultimately used Plan assets for other unauthorized purposes. When Mid America committed to the financial responsibility of guaranteeing that its participating Providers were paid for claims incurred by the Plan's participants and beneficiaries, it was acting as a functional fiduciary wearing the "fiduciary hat." *See Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 917 (7th Cir. 2013) (quoting *Pegram*, 530 U.S. at 225); *see Chao v. Day*, 436 F.3d 234, 235-36 (D.C. Cir. 2006) (where the court held that fiduciary status does not extend to a person who "exercises mere possession, or custody" over plan assets, but found that the defendant who received plan assets to purchase insurance policies was a fiduciary when he kept the money and provided fake insurance policies) (internal quotations omitted). Mid America's control over the Plan assets supports a finding of fiduciary status because the Fund's claims for breach of fiduciary duty arise from Mid

America's handling of the Plan assets. Mid America's responsibility to disburse was neither a ministerial role nor a mere possession of Plan assets. All of Mid America's responsibilities directly affected Plan participants and show control of the management and disposition of Plan assets. Thus, these undisputed facts support the contention that Mid America was a functional fiduciary as defined under § 1002(21)(A)(i).

### 2. Silver

Silver argues that the evidence provided by the Fund fails to demonstrate that the undisputed material facts render Silver a fiduciary within the meaning of ERISA. This argument fails—the Court holds that Silver is a functional fiduciary of the Plan.

What is apparent to this Court is that Silver possessed authority and control over the management and disposition of Plan assets. Silver acted as an intermediary between the Fund and the Providers. Although Silver did not perform daily duties for the Fund or make determinations concerning eligibility, coverage or claim disputes, he did have discretion over which Providers' claims would be paid pursuant to the EOB forms and informed the Fund of how much money he would need to pay those Providers. The Fund would then send him checks payable to Mid America to disburse among the Providers. Those checks were deposited into Mid America's primary bank account under Silver's name.

Silver also argues that there are genuine issues of material fact as to whether he had "sufficient identity" with Mid America and if he had the "requisite knowledge

and control to impute liability on him" based upon Mid America's actions. Silver did not simply have an ownership interest in Mid America. Regardless of what Silver delegated to his employees to perform, he had the responsibility as sole shareholder and president of Mid America to supervise everyday activities. *See Leimkuehler*, 713 F.3d at 914 (" . . . a functional fiduciary under Section 1002(21)(A) owes a duty to a plan through its actions, regardless of whether it chose to assume fiduciary responsibilities or even anticipated that such responsibilities might arise."). Hence, the record supports the conclusion that Silver acted as a functional fiduciary. Like Mid America, Silver was also wearing the "fiduciary hat" with respect to the action at issue—the misappropriation of Plan assets.

### B. Breach of Fiduciary Duty

A beneficiary is entitled to relief for a breach of fiduciary duty if he proves that: (i) the defendant is a plan fiduciary; (ii) the defendant breached its fiduciary duty; and (iii) the breach resulted in harm to the plaintiff. *Killian v. Concert Health Plan*, 742 F.3d 651, 658 (7th Cir. 2013). When assessing whether a person can be held liable for breach of fiduciary duty, a court must ask whether [that] person is a fiduciary with respect to the particular activity at issue. *See Larson*, 723 F.3d at 917. ERISA imposes general standards of loyalty and prudence that requires fiduciaries to act solely in the interest of plan participants and to exercise their duties with the "care, skill, prudence, and diligence" of an objectively prudent person. 29 U.S.C. §1104(a)(1); *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 679 (7th Cir. 2014). A

fiduciary . . . must act prudently in the managing of plan assets. *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2463 (2014).

29 U.S.C. § 1105 states that a fiduciary is liable for the breach of another fiduciary with respect to the same plan:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

A fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account. 29 U.S.C. § 1106(b)(1)(A). In addition, a fiduciary may not engage in a direct or indirect transaction constituting a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D); *Fish*, 749 F.3d at 679-80. A plan fiduciary is a party in interest, as are officers, directors, and major shareholders of a plan sponsor. *Id*. at 680. A fiduciary also has a duty to disclose material information to beneficiaries of trusts, or the plan participants. *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010). This duty "encompasses both an obligation not to mislead the participant of an ERISA plan, and also an affirmative obligation to communicate material facts affecting the interests of plan participants." *Id*. There are exceptions to

prohibited transactions, including those listed in 29 U.S.C. § 1108.  However, those exceptions do not apply to the instant matter.

### 1. Mid America

The Fund's principal argument is that Mid America breached various fiduciary duties by diverting Plan assets.  The threshold question of whether Mid America was acting as a Plan fiduciary when the action subject to the complaint occurred can only be answered in the affirmative.  This is because the Fund's complaints about Mid America misappropriating Plan assets are entirely related to Mid America's duties as a fiduciary.  Mid America owed the Fund a duty to administer the Plan assets in the Fund's interest, not its own.  It is undisputed that Mid America failed to transfer certain Plan assets to Providers and subsequently misled Plan participants by failing to communicate these material facts affecting their interests in compensating Providers for services rendered.  One illustration of this is the fact that Mid America continued to use Plan assets once the parties terminated its relationship by paying $75,000 to its former attorney in this case from MABS's primary bank account.  In addition, the evidence shows that some of the Plan assets were sent to Sync Capital, Tavernita and Mercadito, all of which are companies that Mid America's sole shareholder and president, Silver, had direct association with through Sync Capital.  The parties dispute his exact relationship with these companies, but regardless, Silver had a definite interest in each business.  None of the aforementioned actions had any association with the Plan.

The Court concludes that Mid America's misappropriation of Plan assets was a violation of its fiduciary duties under 29 U.S.C. §§ 1104 and 1106. The evidence shows that Mid America pursued a course of conduct that benefited Silver's interests at the expense of Plan participants and beneficiaries. Consequently, Mid America's imprudent decisions to divert funds from the Providers adversely affected the beneficiaries. Given these facts, Mid America's misuse of Plan assets constitutes a breach of its fiduciary duties under ERISA, which directly harmed the Fund and its participants and beneficiaries.

### 2. Silver

As the president and sole shareholder of Mid America and Plan fiduciary, Silver is considered a party in interest under § 1106(b)(1)(A). Silver acted in his own interest when he used Plan assets, intended for Plan participants' vision care claims, for personal use, which resulted in the harm to the Plan participants. Nothing in the record indicates that the arrangement between the Fund and Defendants authorized Silver to use Plan assets for issuing shareholder loans to himself, using the funds for his other companies, payroll, rent and utilities, etc. Under § 1104(a)(1), Silver was required to discharge his duty solely in the interest of the participants and beneficiaries of the Fund. 29 U.S.C. § 1104(a)(1). His failure to remit Plan assets to pay claims incurred by Plan participants and beneficiaries and his retention of those funds is such a clear breach of his fiduciary duties to the Plan under 29 U.S.C. §§ 104 and 1106 that it does not need to be expounded upon further.

Additionally, Silver is also liable under 29 U.S.C. §§ 1105 for Mid America's breach of its fiduciary duties. After discovering that there were outstanding Provider claims, the Fund attempted to correspond with Silver on multiple occasions, but nothing was resolved. The evidence shows that Tracy forwarded these email correspondences to Silver. Defendants also received countless communications from unpaid Providers. With only two other employees, this Court refuses to believe that Silver, as the president and sole shareholder of such a tight-knit corporation, had zero knowledge of the misappropriated funds. As a fiduciary himself, Silver had the obligation to ensure Mid America complied with its responsibilities. Silver does not point to any evidence that he made reasonable attempts to remedy the situation and thus, he is liable for Mid America's breach.

### C. Corporate Veil

With respect to Silver's individual liability, veil-piercing is an equitable remedy governed by state law. *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009). Under Illinois law, a court may pierce the corporate veil and hold an individual shareholder liable for his corporation's conduct when: (i) there is such unity of interest and ownership that the separate personalities of the corporation and the individual do not exist; and (ii) where the circumstances are such that an adherence to the fiction of a separate corporate existence promotes injustice or fraud. *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 462 (7th Cir. 1991). Four of the eleven factors are pertinent to this case when deciding if there is a unity of interest and

ownership to justify piercing the corporate veil. They include: (i) inadequate capitalization; (ii) failure to observe corporate formalities; (iii) commingling of funds; and (iv) division of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors. *See Boudreau v. Gentile*, 646 F.Supp.2d 1016, 1023 (N.D. Ill. 2009) (citing *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. 2d Dist. 2005)).

This Court has already established an independent basis for holding Mid America liable. Having established corporate liability, the Court finds that Silver's actions, throughout his tenure as president and sole shareholder of Mid America, warrant this Court's piercing of the corporate veil. First, the parties argue over whether the Fund has provided enough information to establish that Mid America was inadequately capitalized. Under Illinois law, the legal test for assessing whether a corporation is adequately capitalized is if it has so little money that it cannot operate its business "on its own." *See Lay-Com*, 580 F.3d at 612. The corporation must have adequate equity (usually in addition to debt), though how much equity depends on the facts of the case. *Id*. To establish undercapitalization, the moving party must set forth evidence of what proper capitalization would be. *Auto Fin. Corp. v. Joliet Motors, Inc.*, 761 F.Supp.2d 789, 793 (N.D. Ill. 2011). Silver argues that the Fund has failed to do just that.

In considering the alleged undercapitalization, the Court assesses Mid America's Profit and Loss Statements and ledgers. The 2011 Profit and Loss

Statement reveals that approximately 97.5% of MABS's total income came from the Fund. It does not reflect income from Providers who paid a monthly fee to Mid America to be part of its network. Pursuant to the arrangement, Mid America was required to distribute all amounts paid to it by the Fund, with the Agreement stating that Mid America would not be paid for its services to the Fund except for the fees set on Exhibit A. Since Exhibit A is not in evidence, the Court can only use the undisputed evidence provided. However, because "undercapitalization is almost never the only factor in a decision to pierce the corporate veil", and the other factors clearly establish unity of ownership and interest between Defendants, the Court moves on. *Lay-Com*, 580 F.3d at 614.

As to the remaining factors, the only documents Silver produced in attempt to portray to the Court that he observed corporate formalities was three one-page documents he considers minutes from annual meetings, and bylaws from MABS and Allison Enterprises. Silver's argument that he adequately maintained shareholder loan reports is alarming considering that the September 19th Loan on one of the reports is listed in MABS's bank account summary as "bill payment" to Tavernita. Silver's contentions of proper "loan documentation" does not sway this Court into believing that Silver followed appropriate corporate formalities. Silver also comingled Mid America's assets with companies that he has ownership interest in, and diverted these Plan assets to other individuals and entities without satisfying Providers' claims.

These factors combined demonstrate the unity of interest and ownership between Defendants that separate personalities of the two no longer exist. Irrespective of Silver's attempt to settle certain Provider claims, those Plan participants and beneficiaries still suffered harm. To illustrate, Providers expended time and resources in search of the compensation they rightly deserved. At the same time, the Plan participants and beneficiaries were unfairly targeted for unpaid claims and the Fund was contacted by various Providers regarding Mid America's failure to pay. Silver's attempt to rectify his actions through settlements with several Providers was too little too late. Accordingly, the Fund has satisfied both conditions required for this Court to pierce the corporate veil.

### D. Unjust Enrichment & Restitution

The Fund "may seek make whole money damages as an equitable remedy under section 1132(a)(3) if [it] can in fact demonstrate that [Defendants] breached [their] fiduciary duty to [it] and that the breach caused [it] damages." *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 882 (7th Cir. 2013) (citing *CIGNA Corp. v. Amara*, 131 S.Ct. 1866, 1881-82 (2011). Under ERISA, plan participants, beneficiaries, or fiduciaries may bring a civil action "to enjoin any act or practice that violates [ERISA] or the terms of the benefit plan, or to obtain other equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3). The Fund is seeking relief authorized by § 1132(a)(3).

Whether restitution is deemed a legal or equitable remedy depends on "the basis for the plaintiff's claim and the nature of the underlying remedies sought." *Great-West Life & Annuity Ins. Co v. Knudson*, 534 U.S. 204, 213 (2002). Restitution is appropriate in this case because it is being sought as an equitable remedy. A plaintiff may seek restitution under § 1132(a)(3) where it seeks to be restored of the property that is wrongfully in the defendant's possession. *Id*. at 214; *see also Harris Trust & Sav. Bank v. Provident Life & Accident Ins. Co.*, 57 F.3d 608, 615 (7th Cir. 1995) (recognizing that a claim for restitution under §1132(a)(3) may lie "when one party has been enriched at another's expense."). Unjust enrichment and restitution are essentially two names for the same equitable remedy. *Bobak v. Federal Exp. Corp.*, 97 C 7066, 1999 WL 160223, at *7 (N.D. Ill. 1999). In Illinois, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Nemitz v. Metropolitan Life Ins. Co.*, 12 C 8039, 2013 WL 3944292, at *7 (N.D. Ill. 2013) (citation omitted).

Under § 1104(a)(1)(A), a fiduciary is required to discharge its duties for the exclusive purpose of providing benefits to plan participants and beneficiaries and defraying (or bearing the cost for) expenses of administering the plan. 29 U.S.C. § 1104(a)(1)(A). Silver claims that there is a genuine issue of fact as to whether the missing Plan assets were used for purposes other than reasonable costs for

such things as office supplies, rent and payroll. He avers that he was entitled to reasonable costs, and that if Exhibit A was in evidence, that it would prove that the Fund still owes him administrative fees of $279,202. However, this Court does not consider the shareholder loans and cashier's check to Silver himself and his other businesses as "expenses" for administering the Plan. Although Tracy alleges in her declaration that rent was paid through Sync Capital, MAB's Ledger and 2011 Profit and Loss Statements show that Mid America did defray expenses for administering the plan through payments for rent, stationary, supplies, office expenses and utilities from MAB's bank account. Additionally, the record reflects that the employees were paid by Sync Capital, the same company owned by Silver, which also provided payroll services. There is no concrete evidence the Fund negotiated with Mid America or Silver to pay an administrative fee and this lack of evidence does not then create a question of fact for the Court to consider. Nothing in the record shows that Silver is "out of pocket" any money for Mid America's contribution of services to the Fund. Rather, the Court finds that the incentive for Mid America to act on behalf of the Fund was the fees it generated with Providers.

Silver also declares that there is a question of fact as to whether the use of such funds to defray overhead costs was unjust. Silver asserts that the Fund was not unjustly enriched because he has negotiated and settled more than $300,000 worth of Provider claims. The Court finds this argument unconvincing—Silver's prior actions as the sole shareholder and president of Mid America had "the singular effect of

making it impossible to place [the Fund] back in the literal position [it] would have been if the breach had not occurred. . ." *See Kenseth*, 722 F.3d at 885. Silver controlled the Plan assets, misused them, and therefore, even if he settled claims and negotiated reductions with Providers, this Court still holds that he must disgorge any benefit gained by virtue of settling claims for less than their face value. Defendants' retention of the Plan assets, or settlements thereof, that were intended to satisfy Plan participants and beneficiaries unpaid vision care claims would violate the fundamental principles of justice, equity, and good conscience. As specified in Part B, *supra*: (i) Plan participants and beneficiaries experienced actual harm as their claims were and may still be unpaid; (ii) Providers treated participants and beneficiaries without compensation; and (iii) the Fund was harmed by Defendants' breach when the claims of their participants and beneficiaries remained unpaid. Therefore, the Fund has met the requirements for its claim of restitution and also unjust enrichment.

**E. Damages**

Given the above-mentioned findings of fact and conclusions of law in this case involving Defendants' liability, the only issue left to be decided is the extent of damages. However, there is uncertainty as to the amount of missing Plan assets including a dispute between the parties as to the amount of money that the Fund paid to Mid America between the date of the Termination Notice and December 31, 2012. This Court hereby orders an accounting of Mid America's assets during this period to determine the appropriate damage amount. When the accounting is completed, the

Fund shall submit its claimed damages in full to the Court, with the opportunity for Defendants to contest the amount requested at the appropriate time.

## CONCLUSION

For the foregoing reasons, this Court grants summary judgment in favor of the Fund.

_____
Charles P. Kocoras
United States District Judge

Dated:  August 27, 2014